[No. 30469. Department One. October 4, 1948.]

*In the Matter of the Petition of the* TOWN OF ISSAQUAH *to Condemn Property.*

THE TOWN OF ISSAQUAH, *Respondent,* v. WILLIAM W. GORDON, *et al., Appellants.*[1]

*Allen, Hilen, Froude & De Garmo, William H. Goucher, Frank A. Pellegrini,* and *Peyser, Bailey & Cartano,* for appellants.

*John W. Dobson, Rummens & Griffin,* and *Kenneth P. Short,* for respondent.

SCHWELLENBACH, J.—The issue in this appeal is stated by appellants in their brief:

"The sole question involved is a determination of the amount of compensation to be awarded to appellants herein for the taking of their property by the Town of Issaquah by condemnation."

[1]Reported in 197 P. (2d) 1018.

On October 28, 1946, the town council of Issaquah adopted ordinance No. 627, providing for the taking and damaging of the northeast quarter of section 35, township 24 North, range 6 E. W. M., for the purpose of protecting the town's supply of water from pollution. This property included the waters of Lake Tradition. January 6, 1947, the town of Issaquah instituted these condemnation proceedings against Robert S. Fraser and wife, William T. Baker and wife, William W. Gordon and wife, county of King, Weyerhaeuser Timber Company, and Mount Lake Co., Inc. Later, by appropriate court orders, the following were permitted to intervene in the action: Maxwell Chase, Fred C. Drew, Horace L. Conrad, Frank I. Sever, Cecil H. Belcher, Vern Cole, doing business as Vern Cole Realty Co., Reginald C. Bastow, Arthur G. Borchman and wife, and O. A. Renning and wife.

This property on Lake Tradition was sold in 1944, by one Beatty, to Fraser and wife, for thirty-five hundred dollars. In March, 1946, Fraser sold approximately 126.6 acres to Gordon for six thousand dollars. Gordon hired engineers to conduct a survey, subdivide the property, and prepare a replat, which was presented to the county planning commission; and then proceeded with an intensive selling program. Advertisements were placed in the newspapers, and a salesman was stationed on the location.

The sales program was successful. By the latter part of June, 1946, thirty-six tracts had been contracted for, to twenty-one individuals, for a total sales price of $24,700. Small down payments were made, the balances to be by payments of twenty or twenty-five dollars a month. Renning paid cash and received a deed. Two of the purchasers received real-estate contracts, and the rest of the transactions were through earnest-money receipts. All of the descriptions were by metes and bounds, no plat having been accepted. Of the twenty-one transactions, nine were being continued at the time of the hearing; the rest having been discontinued by mutual agreement.

In 1940, this property was zoned "F" by the King county planning commission. Zone "F" means that it was zoned

"forestry land" for "public and private parks, playgrounds, camp grounds, and golf courses," and "trappers cabins." This was approved by resolution No. 6494, adopted by the King county board of commissioners.

After the sales program was inaugurated, the Vern Cole Realty Co. presented a replat to the King county planning commission, showing the various subdivisions. The usual rezoning procedure is that, when a replat is tendered to the zoning commission, it is first submitted to the county engineer. After tentative approval by him, it goes to the health department on sanitation. Then it goes up to the county commissioners for final approval. The acceptance of the replat automatically results in rezoning to another class. This is done without any change in the zoning ordinance.

However, before any final approval of the proposed replat, the state department of health addressed the following letter to the planning commission:

"Mr. John N. Todd                              November 14, 1946
"Executive Officer
"King County Planning Commission
"County-City Building
"Seattle 4, Washington
        Subject:  *Issaquah Water Shed—Lake Tradition.*
"Dear Sir:
"This Department has been requested to comment on the petition for rezoning land around Lake Tradition which is a portion of the Issaquah water shed.
"The State Department of Health favors retaining this area in a Forestry Zone for the following reasons:
" (1)  The potential danger of contamination to the Issaquah water supply would be enhanced by numerous persons residing on and frequenting the water shed around Lake Tradition.
" (2)  Changing the zoning might be one step towards the future use of some portions of this area for chicken ranches and the keeping of small numbers of stock, such as pigs and cattle.
" (3) The erection of permanent structures on the lots around Lake Tradition would present a sewage disposal problem that would require careful study and frequent inspection, as the area now subdivided all slopes towards Lake Tradition which in turn, is believed

to feed the springs from which Issaquah derives its water supply.

"(4) If there is any increase in the use of the Lake Tradition area for recreational purposes or for a place in which to live, it will be necessary for this Department to request that Issaquah protect their water supply by continuous and effective disinfection. This would be an added financial burden to Issaquah.

"It has been this Department's policy to keep all possible chance of contamination away from water sheds supplying public drinking water, consistent with the public's need for recreational purposes. The fact that the lots around Lake Tradition were purchased in good faith before the purchasers were aware of these several aspects is to be regretted.

"We hope that the King County Planning Commission will see fit to keep this area zoned as forestry land, thus minimizing chances of contaminating Issaquah's water supply.

"Very truly yours

SANITARY ENGINEERING SECTION
R. O. SYLVESTER (Signed)
ROBERT O. SYLVESTER
District Engineer"

ROS: EL
cc: King County Health Department
Honorable Thomas Gibson, Mayor, Issaquah"

As the result of this letter, the ordinance adopted by the town council of Issaquah on October 28, 1946, culminated in this condemnation proceeding. The planning commission then gave notice to Cole that the case of the replat would not be reopened unless the condemnation failed to go through. The status of the "F" classification of this property has never been changed, and never can be, because of the condemnation proceedings.

Nevertheless, some of the purchasers proceeded to improve their property. They received building permits from King county, which contained the following:

"NOTICE. This permit is issued subject to the provisions of King County Resolutions No. 6494 and No. 8216 and 8235. Also that information furnished by applicant is true and correct."

King county resolution No. 6494 is the zoning resolution classifying this property as "F." They were not advised by Gordon as to the building restrictions. In justice to Gordon, we think he may have acted in good faith, believing that the reclassification might go through. However, Chase, one of the purchasers, in testifying to the court, said:

"A. I say, buying any piece of ground from a plat and the agent assures you the plat is of record, the zoning proposition is automatically taken care of as far as the purchase is concerned, if the plat is recorded. THE COURT: Q. You bought on the assumption that it ultimately would be recorded? A. That was the agreement, Your Honor. That was the basis on which the final payment was to be made, when the plat was recorded and the deed given. Q. (By the Court) If it is not recorded, do you have any arrangement to get your money back? MR. GRIFFIN: Will you answer please. He doesn't get a shake of the head and it doesn't go on the machine. A. Yes, sir."

Gordon admitted that Chase was correct, and that he would get his money back. Chase was, apparently, the only purchaser who learned of zone "F," and with whom this arrangement was made.

The case was tried to the court, which made the following awards:

"(a) Robert S. Fraser and Myrtabel Fraser, his wife.... $6,500.00
"(b) Reginald C. Bastow............................... 1,305.41
"(c) Arthur G. Borchman and Grace Borchman, his wife. 757.72
"(d) Maxwell Chase and ———— Chase, his wife...... 1,157.50
"(e) Cecil H. Belcher and ———— Belcher, his wife.... 191.36
"(f) William W. Gordon and Grace Gordon, his wife.... 10,797.84
"(g) Weyerhaeuser Timber Co....................... 500.00
"(h) O. A. Renning and Patricia Renning, his wife...... 350.00"

The Frasers and the Weyerhaeuser Timber Company accepted the awards. This appeal is by Gordon and wife, Vern Cole Realty Co., Renning and wife, Borchman and wife, Bastow, Chase, Drew and wife, Conrad and wife, Sever and wife, and Belcher and wife.

Appellants contend that the testimony of respondent's sole expert, Claude M. Ryan, was completely discredited. Mr. Ryan has been engaged in the real-estate business (principally in the Wallingford district in Seattle) since

1917. He has appraised for various banks and insurance companies. He acted as appraiser for the Home Owners Loan Corporation, the Federal housing administration, and for the United States navy. He has never had any experience with subdivisions. He found the value of the property sold by Fraser to Gordon to be $6,500. In arriving at this value, he considered it as a whole, and not as subdivided tracts.

The experts for appellants were Edward H. Clifford, Sherman N. Vandyke, Vern H. Cole, and William W. Gordon, all experienced subdividers, with many years' experience in that kind of work. They found the value to be between $25,000 and $30,000. In arriving at that value, they considered the desirability of the property, the general demand of the public for a place to live, and the fact that, within a few months, sales contracts had been entered into for this property totaling $24,700.

We agree with appellants that evidence of contract sales of the property is a circumstance to be considered in determining its value. However, another factor to be considered is the ultimate outcome of those sales. Here, thirty-six tracts had been contracted for, to twenty-one individuals, for a total sales price of $24,700. Only one contract had been paid out. Of the twenty-one sales, nine were in existence at the time of the hearing, and twelve had been discontinued by mutual agreement. Furthermore, of the nine contracts still in existence, Chase had an agreement with Gordon that he was to get his money back, unless the reclassification from zone "F" went through. All of this would tend to rebut the testimony of appellants' experts as to the demand for this particular property, and would also indicate that the purchase prices in the various sales contracts, totaling $24,-700, were too high. The evidence is very persuasive that, if the properties had been offered for sale at the time of the hearing, there would have been considerable difficulty in making the sales, and that they would not bring nearly as great a sum as they did originally.

Appellant Gordon particularly objects to the award because of the expenditures made by him. He testified that,

in addition to the purchase price of $6,000 for the property, he expended $3,336.80. He also estimated his time to be worth $3,000, and Mr. Cole's to be worth $1,500. If he had expended all of that money, such expenditures would not have necessarily increased the value of the property. The question was: What was the property actually worth at the time of the hearing?

The King county planning commission was organized under the provisions of Rem. Rev. Stat., (Sup.), § 9322-1 to -12 [P.P.C. § 776-1 to -23], inclusive. Section 9322-6 provides:

"For any or all of such purposes any such council or board, on recommendation of its commission, may divide the municipality or any portion thereof into districts of such size, shape and area, or may establish such official map or maps, or development plans for the whole or any portion of the area of such municipality as may be deemed best suited to carry out the purposes of this act; and within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land."

Rem. Rev. Stat. (Sup.), § 9304-2 [P.P.C. § 414-3], pertaining to plats and subdivisions, provides:

"Each such plat, subdivision or dedication, before any of its lots or tracts may be sold or offered for sale, shall first be submitted for approval to the legislative or planning authority having jurisdiction thereof as herein prescribed, *and no sale or offer for sale shall be made unless and until the same shall be approved by such authority as herein provided with the written approval of such authority* duly shown thereon or attached thereto *and until the same has been duly filed for record with the auditor* of such county in which the land so platted, subdivided or dedicated is located." (Italics ours.)

It was the duty of the trier of fact to determine the amount of damages to each owner, for the taking of his property by the city. The trial court made such determination in finding No. 6:

"This Court finds the fair reasonable market value of the properties under condemnation with improvements, if any, as of the date of said condemnation as follows:

"(a) Respondent Fraser Tract 1, above described $6,500.00 and the said Fraser sustained no damage by reason of severance.

"(b) Intervenors Bastow, value of land $1,333.33; improvements $1150.00; total, $2,483.33; Bastow is indebted to Gordon under this contract of purchase $1,177.92 and thereby sustains damage $1,305.41.

"(c) Intervenor Borchman, value of land, $200.00; improvements $1,000.00; total $1,200.00. Borchman is indebted under his contract of purchase to Gordon $442.28 and thereby sustained damage $757.72.

"(d) Intervenor Renning, value of land $250.00; improvements, $100.00; total $350.00 and thereby sustained damage $325.00.

"(e) Intervenor Sever, value of land $93.75; improvements $200.00; total $293.75. Sever is indebted to Gordon in sum of $549.55 whereby the award herein is payable to Gordon.

"(f) Intervenor Chase, value of land $637.50; improvements $1500.00; total $2137.50. Chase is indebted to Gordon under his contract of purchase $980.00 and thereby sustained damage $1157.50.

"(g) Intervenor Drew, value of land $637.50; improvements $50.00. Drew is indebted to Gordon under his contract of purchase $1071.79; the award herein is payable to Gordon.

"(h) Intervenor Belcher, value of land $975.00; improvements $100.00; total $1075.00. Belcher is indebted to Gordon under his contract of purchase $883.64 and thereby sustains damage $191.36.

"(i) Intervenor Conrad, value of land, $600.00, improvements, none, Conrad is indebted to Gordon $1018.61; the award herein is payable to Gordon.

"The only other improvements are upon the Brock tract of a value of $425.00; Brock did not appear in this action.

"Considering the tracts sold Chase, Belcher, Sever, Conrad, and Drew, Gordon has remaining 70.77 acres with a value of $5307.75; Gordon has sustained damage in said sum, plus Brock improvements $425.00 with Sever valuation $293.75 and Drew valuation $687.50, and Conrad $600.00, or to-wit: $7,314.00. Gordon also receives Bastow balance $1177.92, Borchman $442.28, Chase, $980.00 and Belcher $883.64, or to-wit: $10,797.84."

No objection is made to the findings as to improvements.

█ Market value is defined in 29 C. J. S. 974, Eminent Domain, § 137, as follows:

"The market value of property injured or taken for public use is commonly defined as the price it will bring when offered for sale by one who desires, but is not required, to sell, and is sought by one who desires, but is not required, to buy, after due consideration of all the elements reasonably affecting value."

■ The question, therefore, resolves itself down to this: What would a willing buyer, not required to buy, pay, at the time of the hearing, for each piece of property taken, to a seller who was willing to, but not required to sell? In determining that question, it was the duty of the trier of fact to take into consideration the original price paid, the improvements made thereon, the desirability of the property, the demand for such property, the use to which it could be put, and all other factors which would enter into a sale between a willing buyer and a willing seller, not compelled to buy or sell.

■ Regardless of the use *intended* at the time the original sales were made, it is undisputed that, at the time of the hearing, the property was classified as zone "F," and it would continue, because of the condemnation proceedings, to be so classified. It was zoned forestry land "for public and private parks, playgrounds, camp grounds, and golf courses," and "trappers cabins." We feel that the trial court made proper awards for the taking of the appellants' property.

Appellants urge that the trial court based its decision on its view of the property, rather than upon the evidence of the witnesses. From questions which were asked by the trial court, it is certain that it must have viewed the premises at the beginning of the trial. With such divergent views between the experts as to value, we do not see how the trial court could possibly arrive at an intelligent solution without viewing the property. However, we are satisfied, from the record, that the trial judge did not base his decision upon what he saw, but merely took advantage of his view of the property to assist him in interpreting and analyzing the testimony of the witnesses.

The judgment appealed from is affirmed.

MILLARD, BEALS, SIMPSON, and HILL, JJ., concur.